[No. D008371. Fourth Dist., Div. One. June 5, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL RAY HENDERSON, Defendant and Appellant.

1634

## COUNSEL

Roy R. King, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Lilia E. Garcia and Esteban Hernandez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HUFFMAN, J.**—Michael Ray Henderson appeals from his judgment of conviction entered after the court denied his pretrial motion to suppress evidence under Penal Code section 1538.5 and he pleaded guilty to manufacturing methamphetamine (meth) (Health & Saf. Code, § 11379.6, subd. (a)).[1] We have determined the trial court erred in denying the motion to suppress. While the court properly concluded the police had consent to enter the premises here to find a clandestine meth laboratory, it prematurely denied the motion without analyzing the legality and effect of video surveillance. We thus reverse and remand the matter for further consideration of the suppression issue.

---

[1] All statutory references are to the Health and Safety Code unless otherwise specified.

I

## Factual and Procedural Background

At the end of June 1987, Larry Joseph Hake was approached by his ex-brother-in-law, Charles Allen Bub, about using Hake's Palm Springs condominium (condo) to manufacture some meth. Bub did not know Hake had been working periodically over the previous two years for the Drug Enforcement Agency (DEA) as an informant infiltrating illegal drug laboratory rings. Bub indicated he would need the condo for only three or four days and, in exchange, would give Hake some of the meth he produced. He explained Palm Springs was a good location for a lab because there were too many arrests occurring in San Diego.

Hake had full use of the Palm Springs residence as part of his compensation as vice-president of the Grace Corporation, which actually owned the condo. Because he was also house-sitting his employer's residence in Rancho Mirage that summer, he maintained both residences at the same time, keeping some of his personal effects and clothing at each place.

Hake expressed interest in the plan, and the two arranged to meet at the El Sombrero Restaurant in San Diego on July 18 to discuss further details. Before this meeting, Hake contacted the DEA regarding Bub's offer, and agreed to keep the DEA advised of all developments. At that time, the DEA also placed an electronic transmitting device on Hake for the anticipated meeting with Bub. Unfortunately, the tape recording made at the meeting was undecipherable.

In furtherance of the plan, on August 11, Bub telephoned Hake and asked him to pick up some hydrotic acid, one of the three ingredients needed for producing meth, at a house in Chula Vista and transport it to the condo. Because he had recently been arrested on other drug charges, Bub wanted Hake to transport the chemicals as a precaution from being stopped for possession of meth chemicals in his car. Hake agreed. Before taking the acid to Palm Springs, Hake took it to DEA agents so they could examine, mark and photograph it.

A few days later, Hake gave DEA agents permission to set up hidden videotape equipment in the condo to allow them to surveil Bub's planned clandestine meth lab. The agents did not obtain a search warrant for this surveillance because they believed Hake lived in the condo and had authority to consent to their entry into the condo for purposes of installing the equipment. Although they knew of Hake's house-sitting arrangement, they

had noticed Hake's personal effects, clothing, and documents in the condo and that he used his own keys to unlock the door of the condo.

With Hake's permission, they placed two cameras in the condo—one upstairs and one downstairs—and set up the viewing monitors in a nearby condominium they rented within the same complex. Since the equipment could be turned on and off from a remote location, the audio transmitters were used only when Hake was inside the condo. No other video surveillance equipment was placed outside of the condo.

On August 21, Bub again telephoned Hake, asking him to pick up the other two chemicals necessary to manufacture meth, ephedrine and red phosphorus, and transport them to the condo. This time, Hake was to meet Bub at a Taco Bell in El Cajon to pick up the chemicals. When Hake arrived there, he met Henderson for the first time. Henderson explained Bub would be a little late for the meeting and left. When Bub arrived, he gave Hake two buckets of chemicals, which Hake again showed to DEA agents before transporting them to Palm Springs.

Thereafter, on August 24, Henderson left a message on Hake's telephone answering machine at the Rancho Mirage house, saying he and Bub would be coming to Palm Springs in a few days. That evening, Henderson and Bub arrived at the Rancho Mirage residence, and Hake gave Henderson a set of keys to the condo. Although he retained a set of keys to the condo, Hake told Bub he and Henderson would have free access to the condo.

Later, Hake returned to the condo several times to "pick up some of his things." Although Bub had never told him not to disturb him and Henderson there, Hake telephoned and rang the doorbell before entering the condo when they were present. While at the condo he saw Bub setting up what appeared to be a meth lab, although it was not fully operational at the time.

On the morning of August 25, Bub and Henderson again came to the Rancho Mirage house, this time to tell Hake "everything was all right" and to borrow a white bowl for mixing chemicals.

That same day DEA agents began a 24-hour watch over the activities in the condo through the video monitors. The upstairs monitor showed Bub and Henderson tending what appeared to be an operational meth lab in the upstairs bathroom. Because the camera was placed at a vantage point outside the bathroom door, the view of the lab was obstructed when either Bub or Henderson entered the bathroom/lab.

Unobstructed, the agents saw Bub wearing goggles and rubber gloves, changing kitty litter in a trash container, getting burned, and writing

notations in a notebook. They also saw Henderson wearing a face mask, and both him and Bub watching over equipment set up in the bathroom. It appeared to the agents the men were following a recipe.

The next morning, August 26, at about 6:10 a.m., the DEA agents went to the condo accompanied by Hake. Consenting to their entry, Hake unlocked the door to the condo. The agents then entered without any "knock and notice" because they feared the explosive nature of the lab and chemicals. They arrested Bub downstairs and Henderson upstairs in the laboratory. The agents also seized the actively cooking lab, some finished meth, and chemicals for producing the meth.

Henderson was charged along with Bub and Susan Margaret Schultz in a four-count information based on drug crimes arising out of two separate incidents. Henderson was charged in count 3 with manufacturing meth (§ 11379.6, subd. (a)) and in count 4 with conspiring to manufacture that drug based on 12 overt acts spanning a period from July 18 to August 25, 1987, concerning the incident at the condo (§ 11379.6, subd. (a); Pen. Code, § 182, subd. (1)). Schultz was charged in counts 1 and 2, which were totally unrelated to the charges against Henderson, and Bub was charged in all four counts.

Henderson then filed a separate motion to sever his trial from that of Bub and Schultz and also joined in their motions to sever, to suppress evidence under Penal Code section 1538.5, to dismiss, both nonstatutorily and under Penal Code section 995, for further discovery, and to exclude evidence.[2] The parties stipulated the preliminary hearing transcript could be received into evidence for purposes of the motions.

The trial court found Henderson had no standing to challenge the search of another residence involving Bub and Schultz, and denied the motion to suppress the evidence found in the condo on grounds the entry into that building was consensual and Bub and Henderson did not possess an exclusive license to use the premises. The court further found there was no statutory basis to exclude the videotape evidence. The court then granted Henderson's motion to sever his trial from the other defendants and denied the other motions.

Henderson subsequently pleaded guilty to one count of manufacturing meth in exchange for dismissal of the conspiracy charge and the prosecution's agreement not to oppose a recommendation of local time.

---

[2] Henderson acknowledged he had no standing to join in his codefendants' motion to traverse the search warrant for entry into the house in the first incident involving counts 1 and 2.

After considering the probation report, the court placed Henderson on three years' formal probation, conditioned upon, among other things, serving one year in county jail. Henderson stated he was going to file an appeal and requested the court stay execution of his sentence. The court denied the request and Henderson has timely appealed.

## II

### DISCUSSION

Preliminarily, we note both Henderson and the Attorney General devote considerable discussion in their appellate briefs to the issue of Henderson's standing to challenge the warrantless search of the condo. Both point to the court minutes where the court found Henderson without standing to argue their respective positions. However, the court's comments rejecting Henderson's standing for the suppression motion pertained only to the search warrant entry into the house in the separate incident involving counts 1 and 2. The court did not address Henderson's standing regarding his objection to the admission of the evidence for counts 3 and 4.

Nor did the People raise the issue of Henderson's standing to bring the motion to suppress as to those counts at the time of the hearing. The People merely argued the justification of the search of the condo stood or fell on the issue of the consent exception. ■ Failure to raise the issue of standing in the court hearing so that Henderson would have an opportunity to prove it operates as a waiver. (*Steagald* v. *United States* (1981) 451 U.S. 204 [68 L.Ed.2d 38, 101 S.Ct. 1642]; *People* v. *Lindsey* (1986) 182 Cal.App.3d 772, 776 [227 Cal.Rptr. 550].)

■ Even assuming the court had found Henderson did not have standing to challenge the denial of the suppression motion concerning the condo, considering the "totality of the circumstances" here, we would find otherwise. ■ ■ ■ ■ The record is replete with evidence to establish standing under federal law. (See *People* v. *Koury* (1989) 214 Cal.App.3d 676, 685-691 [262 Cal.Rptr. 870]; see also *United States* v. *Haydel* (5th Cir. 1981) 649 F.2d 1152[3] (using the analysis employed in *Rakas* v. *Illinois* (1978) 439 U.S. 128 [58 L.Ed.2d 387, 99 S.Ct. 421]).[4] Henderson and Bub

---

[3] While lower federal court cases are not binding precedent on this court, they are persuasive authority reflecting federal law.

[4] "Other factors to be weighed include whether the defendant had a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy

were authorized to stay at the condo for at least three or four days, enjoyed unencumbered access to the premises, stayed overnight there, had joint control and supervision of the bathroom where the meth lab was located, and through their actions exhibited a subjective belief they would be free from governmental intrusion. Such factors clearly give Henderson standing to challenge the denial of the motion to suppress the evidence of the warrantless video surveillance and entry into the condo.

Standing aside, Henderson contends the trial court committed reversible error in failing to suppress the evidence found during the warrantless search of the condo. In denying the motion to suppress, the court found Hake was a cotenant of the condo and his consent given the governmental agents to enter and surveil the condo permitted a lawful warrantless search because they could reasonably and in good faith rely on his apparent authority over the premises. Due to the validity of Hake's consent, the court further found that, absent an applicable statute, the videotape surveillance was not an additional invasion of privacy.

Henderson had argued to the trial court the videotaping in the condo was unlawful under both the federal statutory scheme for electronic surveillance (18 U.S.C. § 2510 et seq.) and the common law rules of search and seizure. On appeal, he argues such violates only the common law rules. He specifically argues the court's ruling is in error because the videotape surveillance and confiscation of items from inside the condo constituted an unconstitutional search and seizure within the meaning of the Fourth Amendment and on these facts Hake did not have, nor did he reasonably appear to have, authority to consent to the search of the condo.

■ In reviewing a motion to suppress evidence, we defer to the trial court's factual findings which are supported by substantial evidence and independently decide whether the facts of the challenged search and seizure conform to the constitutional standard of reasonableness. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].) Where, as here, the facts are undisputed, we independently review the decision, applying federal law, as well as state law where it does not conflict with federal law, to evaluate the issues involved. (*In re Lance W.* (1985) 37 Cal.3d 873 [694 P.2d 744].)

Having reviewed the record in light of these standards, we conclude the officers could have reasonably believed Hake had authority to consent to their entry into the condo, but that their videotaping cannot be justified by

and whether he was legitimately on the premises." (*United States* v. *Haydel, supra,* 649 F.2d 1152, 1155.)

that consent. The trial court therefore erred in finding the use of the video camera not an additional invasion of constitutional dimension beyond that caused by Hake violating Henderson's privacy rights with his entry into the condo with the police, in the absence of an applicable statute.

Using basic search and seizure law, we have determined the viewing of the videotape by law enforcement agents in Hake's absence from the condo, after it was concededly legally installed, was an illegal search under the Fourth Amendment. However, because the legality of a search and the question of suppression are independent issues, suppression of evidence does not always follow an illegal search. As the trial court's ruling precluded it from reaching this point of analysis, the matter must be remanded to allow that court to determine whether the unlawful video surveillance requires suppression of its fruits in this case. We shall explain.

### A

### The Fourth Amendment Protection From Unreasonable Searches

The Fourth Amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." ■ Its purpose is to "safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." (*Camara* v. *Municipal Court* (1967) 387 U.S. 523, 528 [18 L.Ed.2d 930, 935, 87 S.Ct. 1727].) Stated differently, it protects "people, not places." (*Katz* v. *United States* (1967) 389 U.S. 347, 351 [19 L.Ed.2d 576, 581-582, 88 S.Ct. 507].)

When a search and/or seizure is conducted without a warrant, the key question is whether the warrantless conduct of the law enforcement officers invades a defendant's reasonable expectation of privacy; if so, the conduct impinges on the defendant's Fourth Amendment rights. (See, e.g., *California* v. *Ciraolo* (1986) 476 U.S. 207 [90 L.Ed.2d 210, 106 S.Ct. 1809] (overflight of backyard for observational purposes is not an invasion); *Katz* v. *United States, supra*, 389 U.S. at p. 353 [19 L.Ed.2d at p. 583] (electronic eavesdropping is an invasion and, in the absence of a warrant authorizing it or a recognized exception to the search warrant requirement, an unreasonable one).) The Fourth Amendment, however, does not create privacy rights; it only protects certain of them against particular infringements. (*Katz* v. *United States, supra*, 389 U.S. 347.)

■ Thus the first step in any analysis concerning a claimed Fourth Amendment violation is to determine whether a defendant has a reasonable or justified expectation of privacy. Such determination involves three questions: (1) Whether the defendant has a subjective expectation of privacy; (2) whether the expectation is one which society is prepared to recognize as reasonable (*Oliver* v. *United States* (1984) 466 U.S. 170 [80 L.Ed.2d 214, 104 S.Ct. 1735]); and (3) whether the privacy at issue is personal to the defendant; i.e., whether the defendant has standing (*In re Lance W., supra,* 37 Cal.3d at p. 882).

When law enforcement officers use information-gathering techniques that interfere with a defendant's subjective privacy expectations, the issue then becomes whether the privacy expectation was reasonable in relation to the particular government conduct.

In the area of aural aids, the United States Supreme Court in *Katz* v. *United States, supra,* 389 U.S. 347, held the use of equipment to hear what the unaided ear cannot hear violates reasonable expectations of privacy. This rule has been embodied in state and federal statutes which proscribe eavesdropping and wiretapping activities unless certain prior authorization for such conduct is approved. (See 18 U.S.C. § 2510 et seq.; Pen. Code, §§ 629-637.5.)

The rule in *Katz* has been held to be inapplicable to situations where communications are nonconfidential (*Katz* v. *United States, supra,* 389 U.S. 347; Pen. Code, § 632, subd. (c)); where an informant is present and wired for sound (*United States* v. *White* (1971) 401 U.S. 745 [28 L.Ed.2d 453, 91 S.Ct. 1122]; *People* v. *Murphy* (1972) 8 Cal.3d 349 [105 Cal.Rptr. 138, 503 P.2d 594]; where a conversation is monitored with the consent of one of the participating parties in that conversation (*People* v. *Phillips* (1985) 41 Cal.3d 29, 53 [222 Cal.Rptr. 127, 711 P.2d 423]); where one party to a conversation records it as evidence of crime related to extortion, kidnapping, bribery or any violent felony (Pen. Code, § 633.5); where a jailhouse conversation or telephone conversation between detainees and visitors is secretly monitored for institutional security or when confidential relations are not involved (*Lanza* v. *New York* (1962) 370 U.S. 139 [8 L.Ed.2d 384, 82 S.Ct. 1218]; *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142]); and where a pen register is used to monitor telephone dialing activity (*Smith* v. *Maryland* (1979) 442 U.S. 735 [61 L.Ed.2d 220, 99 S.Ct. 2577]; *People* v. *Larkin* (1987) 194 Cal.App.3d 650, 653, fn. 2 [239 Cal.Rptr. 760]).

Based on its reasoning, however, the rule of *Katz* regarding privacy expectations has also been applied to other sensory aids. For example, the

court in *People* v. *Arno* (1979) 90 Cal.App.3d 505 [153 Cal.Rptr. 624] stated, in holding an individual's "reasonable expectation of privacy extends to that which cannot be seen by the naked eye," (*id.* at pp. 511-512) that "[g]iven today's state of technology, it is impossible to conceptualize a legally significant difference between electronically aided aural perception and optically aided visual view." (*Id.* at p. 511.)[5] In *Arno,* the court determined the use of high-powered binoculars to peer into an office infringed upon the occupant's privacy when the unaided eye could only see the shapes and shadows of persons, but not their activity or the equipment in the office. (*Ibid.*)

Like the court in *Katz,* the court in *Arno* further concluded the test of validity of the surveillance is determined by whether "that which is perceived or heard is that which is conducted with a reasonable expectation of privacy and not upon the means used to view it or hear it." (*People* v. *Arno, supra,* 90 Cal.App.3d at p. 511.)

Some courts have stated the rationale in *Katz* somewhat differently, that a search and/or seizure is not involved if the police conduct does not violate justified privacy expectations. (See, e.g., *Arizona* v. *Hicks* (1987) 480 U.S. 321 [94 L.Ed.2d 347, 107 S.Ct. 1149]; *People* v. *Mayberry* (1982) 31 Cal.3d 335 [182 Cal.Rptr. 617, 644 P.2d 810].) Under this type of analysis, the use of devices, such as magnetometers and X-rays, which aid law enforcement agents to see what would otherwise be invisible, has been held to be a search under the protection of the Fourth Amendment, which must be reasonable to be lawful. (See *People* v. *Hyde* (1974) 12 Cal.3d 158 [115 Cal.Rptr. 358, 524 P.2d 830].)

Similarly, the monitoring of a beeper in a private residence not open to visual surveillance has been held to be a search violating justifiable privacy interests and only lawful if prior authorization for the monitoring was obtained. *(United States* v. *Karo* (1984) 468 U.S. 705 [82 L.Ed.2d 530, 104 S.Ct. 3296].) Also, the warrantless entry of police into an aircraft to install electronic surveillance equipment has been held unlawful in the absence of a search warrant authorizing the entry. *(People* v. *Smith* (1977) 67 Cal.App.3d 638, 653 [136 Cal.Rptr. 764].) However, monitoring of an electronic tracking device, which does not transgress privacy expectations when it is installed, has been held not to be a search subject to Fourth Amend-

---

[5]*Arno* followed the rationale of the federal district court in *United States* v. *Kim* (D.Hawaii 1976) 415 F.Supp. 1252, which in turn relied on *Katz, supra,* 389 U.S. 347, to find optically enhanced observation into the interior of an apartment invaded a reasonable expectation of privacy. "There can be no question, contrary to the government's assertion at oral argument, that the protection recognized by *Katz* includes protection against unreasonable visual intrusions." (*United States* v. *Kim, supra,* 415 F.Supp. at p. 1254.)

ment protection "unless the monitoring reveals information that could not have been obtained through visual surveillance." (*People* v. *Salih* (1985) 173 Cal.App.3d 1009, 1015 [219 Cal.Rptr. 603].)

 Irrespective of the terminology, under the *Katz* standard, the propriety of a warrantless governmental surveillance encompasses an assessment of the reasonableness of the defendant's expectation of privacy in a particular situation, and whether the government agents intruded on that privacy. (*People* v. *Chapman* (1984) 36 Cal.3d 98, 106 [201 Cal.Rptr. 628, 679 P.2d 62]; *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 638 [108 Cal.Rptr. 585, 511 P.2d 33].)

B

Privacy, Consent, Entry and Videotape

Turning to the electronic aid of videotaping used in this particular case, we note that its authorization by way of warrant is not specifically covered in any statutory scheme, other than the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. §§ 1801-1811).[6] Videotaping is a form of conduct which, if used by law enforcement to intrude on the reasonable and justifiable privacy interests of an individual, is subject, like any other governmental action, to the limitations of the Fourth Amendment and the requirements formulated in the cases construing that amendment. (See *Katz* v. *United States, supra*, 389 U.S. 347.) Thus, the trial court's comment Congress must somehow regulate video surveillance by police before it can be found unlawful is inaccurate.

The California Supreme Court earlier clarified the protections of the Fourth Amendment covered all types of searches and seizures: "We now recognize the constitutional encasement which renders inviolable the individual's reasonable expectation of privacy; any governmental intrusion into that privacy is an 'unreasonable search' within the meaning of the Fourth Amendment, whether that intrusion be the traditional physical search [citation] or a surreptitious auditory invasion [citations] *or indeed visual intrusion* [citations]." (*Lorenzana* v. *Superior Court, supra*, 9 Cal.3d 626, 639, italics added.)

Moreover, because a video recorder is a recording device for purposes of the privacy act, which proscribes the use of "any electronic amplifying or

---

[6]Since we find this form of evidence gathering to be a search and seizure within the meaning of the Fourth Amendment, and not prohibited by any legislative restriction, we are confident it could have been authorized by a properly issued search warrant issued under Penal Code section 1524 et seq.

recording device" for the purpose of eavesdropping or recording private communications (*People* v. *Gibbons* (1989) 215 Cal.App.3d 1204 [263 Cal.Rptr. 905]), and the Fourth Amendment protects the privacy of individuals, it also necessarily protects them from video recordings taken in violation of those rights. Several federal circuit courts have come to this same conclusion. (*U.S.* v. *Cuevas-Sanchez* (5th Cir. 1987) 821 F.2d 248; *United States* v. *Biasucci* (2d Cir. 1986) 786 F.2d 504; *United States* v. *Torres* (7th Cir. 1984) 751 F.2d 875.) Thus, the court in *United States* v. *Torres* stated: "It is true that secretly televising people (or taking still or moving pictures of them) while they are in what they think is a private place is an even greater intrusion on privacy than secretly recording their conversations." (*United States* v. *Torres, supra*, 751 F.2d at p. 878.)

Because Henderson's contentions concerning the videotape surveillance of the condo and the validity of Hake's consent to enter and search the condo are so intricately intertwined, we apply Fourth Amendment common law to first determine whether Henderson had a reasonable expectation of privacy in the condo, and if so, to then determine whether the law enforcement conduct in videotaping and then entering the condo was reasonable or infringed on Henderson's justified privacy rights.

### 1. Henderson's Reasonable Expectation of Privacy

Here the trial court, in analyzing the issue of Henderson's privacy interests, stated: "I conclude on the basis of the various things that I've indicated and the circumstances, including the circumstance that the place was going to be used for a few days to make meth, I conclude that this was not a normal tenancy; that it was . . . a license to carry on an activity in the place as distinct from an arrangement amounting to a tenancy. . . .

"But that's only the beginning of the inquiry. I think it's also true that you cannot implant cameras even in property that you control in a way which invades the right of privacy of an individual, a reasonable expectation of privacy. And so you can't put television cameras in your own bathroom, and that wasn't what was done here. The camera was outside the bathroom and the door could have been closed. . . .

". . . . . . . . . . . . . . . . . .

"But the bottom line in this case is that [Henderson] shouldn't have trusted Mr. Hake. Mr. Hake could have hidden in the closet and seen these things or allowed the officers to hide in the closet and seen [*sic*] these things, and it would have been perfectly all right. Instead, they used a camera.

"▪. ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪

". . . In the context of this kind of case, I find that the act of extending the—Mr. Hake's untrustworthiness to the use of the television camera was not such an unreasonable invasion of the defendants' privacy as to invoke a self—a violation of a self-executing portion of the Fourth Amendment." We find the trial court's reasoning is flawed. Under the facts of this case, Henderson did have a reasonable expectation of privacy in the condo.

As we noted at the outset, Henderson had standing to challenge the search of the condo. Regardless of the trial court's characterization he only had a "license to carry on an activity" in the condo, specifically in the upstairs bathroom, the court also found he was a cotenant and coconspirator with Hake, neither of whom had exclusive control over the condo.

Moreover, the facts support a subjective expectation of privacy by Henderson. He entered into a conspiracy with Hake and Bub to set up an illegal meth lab in Palm Springs in Hake's condo for three or four days. At that time, he did not know Hake was an informant. Upon his arrival in Palm Springs he, along with Bub, was given a key to the condo and was told by Hake they would have free access to the condo. The area where the meth lab was set up, the upstairs bathroom, was not open to visual surveillance outside the condo. Although Hake was found by the court to be a cotenant of the condo with the right to come and go as he pleased, the evidence shows he telephoned and rang the doorbell before doing so when Henderson and Bub were present. Under these circumstances, it was reasonable for Henderson to entertain a subjective expectation of privacy in the premises.

Contrary to the court's comment the door to the bathroom should have been closed to exhibit a reasonable expectation of privacy and the People's argument that Henderson thus did not take "affirmative steps" to show his privacy expectation, California courts have generally rejected such positions. The governmental practice of surreptitiously viewing public restrooms when there is no door on the stall has been held to be a constitutional violation of an individual's privacy rights protected by the Fourth Amendment. (*Bielicki* v. *Superior Court* (1962) 57 Cal.2d 602 [21 Cal.Rptr. 552, 371 P.2d 288]; *Britt* v. *Superior Court* (1962) 58 Cal.2d 469 [24 Cal.Rptr. 849, 374 P.2d 817].) "The expectation of privacy a person has when he enters a restroom is reasonable and is not diminished or destroyed because the toilet stall being used lacks a door." (*People* v. *Triggs* (1973) 8 Cal.3d 884, 891 [106 Cal.Rptr. 408, 506 P.2d 232], disapproved on another point in *People* v. *Lilienthal* (1978) 22 Cal.3d 891, 896, fn. 4 [150 Cal.Rptr. 910, 587 P.2d 706].)

Further, courts have guarded with particular zeal the right of individuals to carry on private activities within their homes without unreasonable governmental intrusion. (E.g., *Vale* v. *Louisiana* (1970) 399 U.S. 30, 34 [26 L.Ed.2d 409, 413, 90 S.Ct. 1969]; *People* v. *Ramey* (1976) 16 Cal.3d 263, 270-276 [127 Cal.Rptr. 629, 545 P.2d 1333].) ▮ Expectations of privacy are heightened within a private residence: "By opening his curtains, an individual does not thereby open his person, house, papers and effects to telescopic scrutiny by the government." (*United States* v. *Kim, supra,* 415 F.Supp. at p. 1257.) ▮ The failure by Henderson to close a door within the private, locked residence does not dispel the reasonableness of his privacy expectations.

Nor does the fact he placed his trust in Hake destroy his privacy expectations in the condo. As will be discussed later in more length, an individual's mistaken trust in a coconspirator does not waive all of his privacy rights. (See *United States* v. *White, supra,* 401 U.S. 745, 751 [28 L.Ed.2d 458-459].) The fact Hake could have hidden in the closet to see the same actions of Henderson and Bub that were viewed by the law enforcement agents during the 24-hour period of the video monitoring does not negate Henderson's subjective expectation of privacy.

▮ The plain and simple fact is clandestine observations into a private residence from a vantage point inaccessible to the public or an uninvited guest is a search which, if conducted without a warrant, is the type of activity the Fourth Amendment proscribes. (*Lorenzana* v. *Superior Court, supra,* 9 Cal.3d at p. 634.) "[P]rivate residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable." (*United States* v. *Karo, supra,* 468 U.S. at p. 714 [82 L.Ed.2d at pp. 540-541].)

▮ The videotape equipment here was positioned to "see" that which the agents could not otherwise see. Because Henderson had a subjective expectation of privacy within the condo, the video surveillance constituted a search and seizure under the Fourth Amendment and was subject to its protections. We thus reach the issue of the legality of the searches in this case.

## 2. The Consent Exception

▮ The underlying constitutional requirement for all searches and seizures is that they be reasonable (*New Jersey* v. *T. L. O.* (1985) 469 U.S. 325,

344 [83 L.Ed.2d 720, 736, 105 S.Ct. 733])[7] and there is a presumption that one conducted without a warrant is unreasonable, unless it falls within one of the "specifically established and well-delineated exceptions." (*Katz* v. *United States, supra,* 389 U.S. 347, 357 [19 L.Ed.2d 585].)

As noted by the parties in their respective appellate briefs, the searches here were justified in the trial court on grounds of the "consent" exception. ■ This exception provides the warrantless search of property without probable cause will be lawful under the Fourth Amendment when conducted with voluntary, proper consent. (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 219 [36 L.Ed.2d 854, 858, 93 S.Ct. 2041].)

The burden of proving the search comes within the consent exception to the warrant requirement is on the prosecution who must show the consent was valid by a preponderance of the evidence. (*United States* v. *Matlock* (1974) 415 U.S. 164, 171, fn. 7 [39 L.Ed.2d 242, 250, 94 S.Ct. 988]; *People* v. *James* (1977) 19 Cal.3d 99, 106, fn. 4 [137 Cal.Rptr. 447, 561 P.2d 1135].) To be valid, the consent of a party other than the defendant must be free and voluntary and must be accompanied by "common authority over or other sufficient relationship to the premises or effects sought to be inspected." (*United States* v. *Matlock, supra,* 415 U.S. at p. 171 [39 L.Ed.2d at p. 250].) Third party consent is valid when (1) the third party has or reasonably appears to have authority to give consent,[8] and (2) where the searching officers possess a good faith belief in the validity of the consent. (*People* v. *Escudero* (1979) 23 Cal.3d 800, 806 [153 Cal.Rptr. 825, 592 P.2d 312].)

The authority to give consent is normally determined by "mutual use of the property by persons generally having joint access or control for most

---

[7] "Putting to one side the procedural protections of the warrant requirement, the Fourth Amendment generally protects the 'security' of 'persons, houses, papers, and effects' against official intrusions up to the point where the community's need for evidence surmounts a specified standard, ordinarily 'probable cause.' Beyond this point, it is ordinarily justifiable for the community to demand that the individual give up some part of his interest in privacy and security to advance the community's vital interests in law enforcement; such a search is generally 'reasonable' in the Amendment's terms." (*Winston* v. *Lee* (1985) 470 U.S. 753, 759 [84 L.Ed.2d 662, 668, 105 S.Ct. 1611].)

[8] Under the apparent authority doctrine established in *People* v. *Gorg* (1955) 45 Cal.2d 776 [291 P.2d 469], a good faith search conducted by police officers with the consent of a homeowner will not be invalid merely because the officers may have made a reasonable mistake as to the scope of the owner's actual authority over the property inspected. *People* v. *Hill* (1968) 69 Cal.2d 550 [72 Cal.Rptr. 641, 446 P.2d 521] stated the doctrine as: "[A] search is not unreasonable if made with the consent of a third party whom the police reasonably and in good faith believe has authority to consent to their search. . . ." (*Id.* at p. 554.) The reasoning behind this doctrine is consistent with the "police misconduct" rationale for the exclusionary rule judicially determined for Fourth Amendment violations. There is no deterrent effect for the exclusion of evidence obtained by government agents who reasonably and in good faith believe they are acting lawfully. (See *Nix* v. *State* (Alaska 1981) 621 P.2d 1347.)

purposes, so that it is reasonable to recognize that [they have] the right to permit the inspection . . . and that the others have assumed the risk that one of their number might permit the common areas to be searched." (*United States* v. *Matlock, supra,* 415 U.S. at p. 171, fn. 7 [39 L.Ed.2d at p. 250]; see also, *People* v. *Jacobs* (1987) 43 Cal.3d 472, 481 [233 Cal.Rptr. 323, 729 P.2d 757].) However, the third party giving the consent must not merely be submitting to a claim of lawful authority or reacting to coercion or duress. (*Florida* v. *Royer* (1983) 460 U.S. 491 [75 L.Ed.2d 229, 103 S.Ct. 1319]; *People* v. *James, supra,* 19 Cal.3d at p. 106.) Nor may the consent be the result of unlawful police activity. (*Wilson* v. *Superior Court* (1983) 34 Cal.3d 777, 791, fn. 12 [195 Cal.Rptr. 671, 670 P.2d 325].)

The determination of voluntariness in the first instance requires careful examination of all facts surrounding the consent (*Schneckloth* v. *Bustamonte, supra,* 412 U.S. at p. 219 [36 L.Ed.2d at p. 858]) and the trial court's resolution of this question is given great deference. However, when consent is the product of unlawful police conduct, it is invalid absent a showing of attenuation. (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 486 [9 L.Ed.2d 441, 454, 83 S.Ct. 407].) For instance, consent to search obtained after an illegal entry may be invalid (*People* v. *Poole* (1986) 182 Cal.App.3d 1004, 1012 [227 Cal.Rptr. 594]); consent obtained during an unlawful detention (*Florida* v. *Royer, supra,* 460 U.S. 491) or after several hours of unlawful arrest and incarceration (*People* v. *Leib* (1976) 16 Cal.3d 869, 877 [129 Cal.Rptr. 433, 548 P.2d 1105]) has been held invalid; and consent to search a car after an earlier illegal search of an office has been held invalid. (*Burrows* v. *Superior Court* (1974) 13 Cal.3d 238 [118 Cal.Rptr. 166, 529 P.2d 590].)

If, under the circumstances of a particular case, consent is found to be invalid, the People are entitled to prove attenuation; i.e., to show there is no nexus between the unlawful police conduct and the consent. *People* v. *Superior Court* (*Keithley*) (1975) 13 Cal.3d 406 [118 Cal.Rptr. 617, 530 P.2d 585].) Factors that bear on attenuation include the proximity of the consent to the law enforcement agents' illegal activity (i.e., the closer, the more tainted), whether the illegality led to the observation of the items or place as to which the agents obtained consent, "whether the consent was volunteered rather than requested, . . . and whether the police purpose underlying the illegality was to obtain the consent." (See 3 LaFave, Search and Seizure (2d ed. 1987) Validity of Consent, § 8.2(d), pp. 193-194.)

With these standards in mind, we turn to the particular searches in this case.

### 3. Entry and Videotape

Basically this case involves three different searches: First, the original entry into Hake's condo with his consent to install the video cameras; second, the twenty-four-hour monitoring of the condo by the police via the cameras; and third, the entry and subsequent search of the condo by the police with Hake's accompaniment and consent.

At the trial level, the first search was concededly proper as conducted with Hake's consent. The other two were justified by the People as also being with Hake's consent on the basis of his cotenant and coconspirator roles and apparent authority to give such consent. After considering the motion papers and argument, the court found Hake to be authorized to give consent to a search of the condo and found not only the entry into the condo proper, but the earlier search via the monitoring of the videotape from the cameras to be proper. ▮ While the court's finding that Hake had authority to consent to the entry of the condo for purposes of searching the premises is sufficiently supported by the evidence in this case,[9] the court's analysis is incomplete.

As we earlier concluded, the court incorrectly determined Henderson did not have a reasonable expectation of privacy in the condo because of his trust in Hake. ▮ While a defendant cannot look to the law to redeem him from the untrustworthiness of a friend who may be a government informant, and who records or transmits their private conversations (*United States* v. *White, supra,* 401 U.S. 745, 751 [28 L.Ed.2d 458-459]; see also

---

[9] Based on the record, the agents could reasonably have possessed a good faith belief in Hake's authority to consent to a search of the condo: While the agents were aware of Hake's house-sitting arrangement, one agent testified he believed Hake resided at the condo, noticing his clothing and personal effects present inside. Hake's possession of a set of keys and his actions of opening the condo for the agents, both to plant video surveillance equipment and to allow the police to enter for the arrest of Henderson, and to let himself into the condo to obtain some personal things gave the agents further support for their belief Hake had control over, as well as a continuing interest in, the condo.

In addition, the court found Hake, although an informant, to be Henderson's coconspirator, as he agreed to the plan and performed overt acts in furtherance of the conspiracy to manufacture meth and a type of cotenant because he had only given Henderson "a license to carry on an activity in the place as distinct from an arrangement amounting to a tenancy." Because there was no showing Hake had granted Henderson exclusive control over the premises nor exclusive control over any one room or area, the court found Hake continued his own interest in the premises as a co-occupant. (See *People* v. *Hamilton* (1985) 168 Cal.App.3d 1058, 1067 [214 Cal.Rptr. 596].) Under the rationale of *Matlock,* that "it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection . . . and that the [other inhabitants] have assumed the risk that one of their number might permit the common area to be searched" (*United States* v. *Matlock, supra,* 415 U.S. at p. 171, fn. 7 [39 L.Ed.2d at p. 250]), the trial court could properly find Hake had apparent authority to validly consent to a government search of the condo.

*Hoffa* v. *United States* (1966) 385 U.S. 293, 302 [17 L.Ed.2d 374, 382, 87 S.Ct. 408]) in situations involving electronic surveillance, the communications are protected in the absence of the government agent by federal law. (*United States* v. *White, supra*, 401 U.S. at p. 752 [28 L.Ed.2d at p. 459].)

As stated in *United States* v. *Padilla* (1st Cir. 1975) 520 F.2d 526, where government agents planted a microphone in a hotel room and recorded the defendant's conversations without his knowledge or consent and the court held the search outside of the presence of the agents was unlawful under the authority of *White* and *Katz*: "The built-in limitation on the frustration of such a person's actual expectation of privacy is that no more can be recorded than is given to one who is, mistakenly or not, trusted. When one's confidante leaves his premises, he is left with an expectation of privacy in his surroundings which is not only actual but justifiable [citation]." (*United States* v. *Padilla, supra*, 520 F.2d at p. 527.)

 Similarly, while Henderson could not reasonably expect to exclude Hake from the condo, nor expect to be protected in his private conversations with Hake under the Fourth Amendment, he could reasonably expect under federal law the premises would remain free from governmental intrusion. (*Rawlings* v. *Kentucky* (1980) 448 U.S. 98, 105 [65 L.Ed.2d 633, 641-642, 100 S.Ct. 2556].) Thus, the communications recorded and transmitted to the DEA via the video cameras here would be valid only so long as Hake was a party to them—aural or visual. (*United States* v. *White, supra*, 401 U.S. at p. 752 [28 L.Ed.2d at p. 459].) Once Hake left the condo, Henderson's expectation of privacy increased, and his Fourth Amendment rights would be violated by continued DEA video surveillance. (*Ibid.*)

The situation here is not unlike the beeper monitoring cases, where if the electronic device is legally installed, the subsequent monitoring is legal "unless the monitoring reveals information that could not have been obtained through visual surveillance." (*People* v. *Salih, supra*, 173 Cal.App.3d at p. 1015.) Here the monitoring revealed the ongoing operation of the meth lab that Henderson had told Hake was ready to go. Hake did not see it in operation. Although he could have hidden in the closet to see the same things the cameras transmitted to the agents, the fact is he did not hide in the closet; he was not present in the condo at the time of the monitoring. The agents were thus viewing things they could not obtain through Hake's visual surveillance and hence the monitoring was unlawful.

We find the trial court's ruling validating the videotaping to be erroneous. The court failed to recognize the reasonable expectation of privacy in the condo created by the assurances given Henderson and Bub by the government's agent. Clearly, validating such a warrantless procedure violates the

purpose of the Fourth Amendment to protect privacy rights and ignores controlling federal authority.[10]

This holding does not encompass emergency, life-threatening situations, where some clandestine surveillance may constitute a justifiable search and seizure. Even if, as the government contends, the "knock and notice" requirement here was properly abandoned due to the explosive nature of the meth lab, this alone does not justify unauthorized surreptitious surveillance inside a private residence. There is no evidence clandestine observation for more than 24 hours was required by the "exigent circumstances" of this case. The government had ample time to obtain a search warrant based on evidence from Hake's own observations, independent of the surveillance in his absence, to justify a consensual entry for the arrest of Henderson and Bub.

Because the court did not separately review the monitoring of the videotape cameras from the consent for the entry issue, it did not determine whether the illegal video monitoring tainted the subsequent entry of the condo. Consequently, the People were not given the opportunity to prove attenuation of any taint. Accordingly, the matter must be reversed and remanded for the trial court to determine whether the consensual physical entry into the condo was tainted by the earlier illegal video surveillance and, if so, what evidence must be suppressed. If the entry can be justified under the "independent source doctrine" (*Murray* v. *United States* (1988) 487 U.S. 533, 537-539 [101 L.Ed.2d 472, 480-482, 108 S.Ct. 2529]), the fruits of that search would be admissible and the motion to suppress again denied. If not, then the court should specifically delineate what evidence would be suppressed since under the facts of this case, much of the evidence coming from Hake would independently be admissible.

### III

### DISPOSITION

The judgment is reversed and the cause remanded to the superior court with directions to vacate Henderson's guilty plea if he makes an appropriate motion within 30 days after this opinion becomes final. In that event, the

---

[10]We note that under the holding of *People* v. *Veiga* (1989) 214 Cal.App.3d 817 [262 Cal.Rptr. 919], coinhabitants who have equal common authority over a premises may validly consent to police entry even when absent from the premises. We do not find this case authority for a similar holding here, however, as federal law is clear in the specific area of electronic surveillance that absent the presence of the governmental agent or mistrusted friend, communications in a premises are protected by the Fourth Amendment. (*United States* v. *White, supra,* 401 U.S. at p. 751 [28 L.Ed.2d at pp. 458-459].)

court is directed to reinstate the original charges against Henderson, if the People so move, and to rehear the matter in light of this opinion. If no such motion is filed by Henderson, the trial court is directed to reinstate the original judgment.

Wiener, Acting P. J., and Benke, J., concurred.