Filed 6/28/24  P. v. Kay CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B330501 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA091812) |
| v. | |
| DIMITRIX JEROME KAY, | |
| Defendant and Appellant. | |

Appeal from order of the Superior Court of Los Angeles County, Gregory A. Dohi, Judge.  Affirmed.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Melanie Dorian, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In November 2019, a burglary suspect fled from police and took refuge in the attic of the house in which appellant Dimitrix Jerome Kay (Kay) then lived. Officers detained and interviewed Kay while they worked to capture the burglary suspect.

Police lacked a search warrant for the house, and the officer interviewing Kay requested consent to search his bedroom. The officer twice advised Kay that he was free to leave and stated expressly that Kay's ability to leave was not conditioned on providing the requested consent. Kay nonetheless consented to the search of his bedroom, where officers discovered evidence of identifying information theft (Pen. Code, § 530.5).[1] The district attorney subsequently filed charges against Kay.

Kay moved to suppress the evidence seized from his bedroom, arguing that his consent was the product of an unconstitutional detention. The trial court denied the motion, concluding that "even if [Kay's] detention was unjustifiably long," his "consent did not result from it" in light of the interviewing officer's statements to Kay that he was free to leave.

Kay now asks us to reverse the court's order denying his suppression motion. Like the trial court, however, we conclude that Kay's consent to the search was sufficiently attenuated from any Fourth Amendment violation. We therefore affirm.

**FACTUAL SUMMARY AND PROCEDURAL HISTORY[2]**

In the early morning hours of November 1, 2019, a man resembling David Allen (Allen)—the boyfriend of Kay's mother and a suspect in a "hot prowl" burglary—attempted to evade police

---

[1] All subsequent statutory references are to the Penal Code.

[2] We summarize here only the facts and procedural history relevant to our resolution of this appeal.

capture by hiding in the attic of the Sherman Oaks, California house where Kay resided. In an effort to apprehend the suspect, officers ordered all occupants of the house, including Kay, to exit the residence.

The officers briefly detained Kay and then directed him to an area adjacent to the house, where he and the other occupants remained for the next 30 to 90 minutes while the 10 to 12 officers already on the scene waited for additional officers, a K-9 unit, and a police helicopter to assist them in forcing the suspect from the attic.[3] Kay was barefoot and clothed in only a jockstrap and bathrobe during the incident; however, he was not handcuffed or otherwise physically restrained.

After the 30- to 90-minute period, Officer Brandon Purece approached Kay, who was walking around and smoking a cigarette, for an interview. During the approximately nine-minute interview, Kay stated that his mother (also a suspect in the burglary) had left several pieces of mail and other evidence of identity theft in the house, and that he had collected the evidence in his bedroom. Officer Purece, who did not possess a warrant to search the house, requested Kay's consent to search his bedroom. Kay consented to the search and left the scene. Officers then searched Kay's bedroom and seized the identity theft-related evidence.

The district attorney subsequently charged Kay with identifying information theft with a prior, in violation of section 530.5, subdivision (c)(2). Kay moved to suppress the evidence seized from his bedroom, arguing that his consent to the search was invalid because it resulted from an unconstitutional, unduly prolonged detention.

---

[3] Officers later determined that the man in the attic was not, in fact, Allen.

At the suppression hearing, the prosecution maintained that Kay had validly consented to the search.  In support of this position, the prosecutor offered testimony from Officer Purece, as well as body camera video footage capturing the interview during which Kay provided his consent.  The footage reflects that— although he did not do so at the outset of the interview—Officer Purece twice advised Kay that he was free to leave the scene before Kay consented to the search:

"[Officer Purece]:  Umm[,] [l]et me ask you this, I know you've got a room here, OK? . . . [L]et me start up with this, I already know who you are[.]  I know your aunt and I know your mom.

"[Kay]:  Yeah, I already know you know.  I'm going to be completely honest with you.

"[Officer Purece]:  I appreciate that.

"[Kay]:  . . . I just want to be able to leave with my friend right now and go to his house because I'm barefoot in a jockstrap.

"[Officer Purece]:  Come here, let me, I just want to respect your privacy—your family is right there.

"[¶] . . . [¶]

"[Officer Purece]:  I understand that your aunt, your mom, [Allen], there's a lot of issues that continue to go on here, OK? [S]o what I'm going to ask you, is there anything in your room? I don't care about little nonsense, I'm not looking for that.  What I'm looking for is—am I going to find stacks of mail?  Am I going to find credit cards?  Anything like that when we go up and search? Do you have anything like that?

"[Kay]:  In my room?  There, to be . . . uhhh . . . Do you want me to be . . . I mean . . . uhh . . . .  The mail that's in there is not mine and it's stuff that I was trying to get rid of because of all of the stuff my mom left behind.  I'm being honest with you.  I just haven't been able to get rid of it all.

"[¶] . . . [¶]

"[Officer Purece]:  OK, so there's a stack of mail in your room, I mean is that kind of what we're getting at—is that what you're getting at?

"[Kay]:  No, there's not . . . I don't know what's in my room to be quite honest with you.

"[Officer Purece]:  Hold on hold on look, [Kay], we're having a one-on-one conversation, you're not going to jail.

"[Kay]:  How am I not going to be going to jail?

"[Officer Purece]:  If you're honest with me and you tell me what's going on here, OK number one.

"[Kay]:  OK.

"[Officer Purece]:  Who's in that attic right now?

"[Kay]:  A guy that I barely know that's [my aunt's] friend[,] Ash (phonetic)[.]  I barely know him.  Do you want me to be real with you?  There is mail in my room.  I've been trying to get rid of it.  It's all been left over by my mother and [Allen].  You don't know the amount of stuff I've been trying to get rid of because of [*sic*] they've left there.  It's been my job to get rid of, I've been waiting for you guys to come . . . .

"[¶] . . . [¶]

"[Officer Purece]:  OK, do you have anything in your bag right now?  Any profiles?

"[Kay]:  He already—The cop searched my bag.

"[¶] . . . [¶]

"[Kay]:  There's nothing in my bag.

"[¶] . . . [¶]

"[Kay]:  Everything is mine in the bag, yes.  Am I allowed to go?

"[Officer Purece]:  OK, look, yes, OK.  [T]hat's why we're having this conversation.

"[Kay]: OK. Thank you. Thank you. I've been trying to change my life and it's hard living in this fucking environment.

"[¶] . . . [¶]

"[Kay]: That's why I want to go with my friend Robert, to his place[.] [H]e lives at [address]. [I]f you have any questions or would like to ask me anything, you're more than welcome to stop by there.

"[Officer Purece]: OK I appreciate that. OK, so cool if we just go up and get that stuff out of your room? Just so that we can clean up your room, that way you don't have to worry about anything else? Are you OK with that?

"[Kay]: If I can leave.

"[Officer Purece]: Yeah—I'm not, that's not a condition of you leaving. I'm not—you can leave right now, I'm simply having a conversation with you.

"[Kay]: Yeah, yeah, yeah that's cool, yeah.

"[Officer Purece]: I'm trying to help you out, you're trying to help me out, OK, it's a mutual thing.

"[Kay]: Yeah, yeah[.] Just go and clear everything out, like you know?

"[¶] . . . [¶]

"[Kay]: I'll do anything I can do to help you guys. . . .

"[¶] . . . [¶]

"[Kay]: I'll do anything in my power to help you find [Allen].

"[Officer Purece]: I appreciate that. That's our biggest concern. Because he's a dangerous guy.

"[¶] . . . [¶]

"[Kay]: Dude, if I have to fucking be a fucking confidential informant . . . , I don't give a fuck, I will do it. Because I want [Allen] fucking in jail."

6

Kay did not testify at the hearing, nor did he introduce any other evidence in support of his motion to suppress.

After receiving Officer Purece's testimony and reviewing the body camera footage, the trial court denied the suppression motion, explaining:

"Even if there was a detention in this case, even one that was unnecessarily prolonged, the defense has failed to show that the consent given by Mr. Kay somehow resulted from the detention. . . . [A]t two separate places[,] Mr. Kay is told, 'You're free to go.' And he's specifically told, 'You can leave right now.' His consent is not a condition of his being permitted to leave. [¶] Not only do the words, themselves, support this interpretation but the overall tone of the conversation is, generally speaking, pretty friendly. Mr. Kay himself repeatedly said . . . he wants to help the police. It's not a situation in which his will was somehow overcome. . . .

"[¶] . . . [¶]

" . . . Here, we have explicit consent on more than one occasion from somebody who was told, 'You're free to go anytime you want to.' [¶] So even if the detention was unjustifiably long, the consent did not result from it, and I don't think the detention was unjustifiably long anyway. [¶] So the motion to suppress the evidence is respectfully denied."

Following denial of the motion, Kay pleaded no contest to identifying information theft with a prior. The trial court suspended imposition of sentence and placed Kay on formal probation for two years.

Kay timely appealed the court's denial of his motion to suppress.

7

## DISCUSSION

### A. *Standards of Review*

Under section 1538.5, a "defendant may move . . . to suppress as evidence any tangible or intangible thing obtained as a result of a seizure" if the seizure "without a warrant was unreasonable." (§ 1538.5, subd. (a)(1)(A).)

In reviewing the denial of a motion to suppress, "[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362 (*Glaser*).)

### B. *The Trial Court Properly Denied Kay's Motion to Suppress the Evidence Seized from His Bedroom*

Kay contends that the trial court should have suppressed the challenged evidence because his consent to the search of his bedroom was involuntary and resulted from an unduly prolonged, unconstitutional detention.[4] We conclude, however, that the court properly denied the motion because Kay's consent to the search was both voluntary and sufficiently attenuated from any alleged Fourth Amendment violation.

"The underlying constitutional requirement for all searches and seizures is that they be reasonable [citation] and there is a presumption that one conducted without a warrant is unreasonable,

---

[4] Although Kay raises claims pursuant to both the federal and state Constitutions, "under the so-called truth-in-evidence provision of the state Constitution, ' "issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards." ' " (*People v. McWilliams* (2023) 14 Cal.5th 429, 437, fn. 2 (*McWilliams*).)

8

unless it falls within one of the 'specifically established and well-delineated exceptions.' [Citation.]" (*People v. Henderson* (1990) 220 Cal.App.3d 1632, 1649–1650 (*Henderson*), fn. omitted.) One such exception exists where a search is "conducted with voluntary, proper consent." (*Id.* at p. 1650.)

"The burden of proving the search comes within the consent exception to the warrant requirement is on the prosecution who must show the consent was valid by a preponderance of the evidence." (*Henderson, supra,* 220 Cal.App.3d at p. 1650.) "The determination of voluntariness in the first instance requires careful examination of all facts surrounding the consent [citation] and the trial court's resolution of this question is given great deference." (*Id.* at p. 1651.)

Here, we agree with the trial court's determination that—particularly in light of Officer Purece's cordial tone and his repeated statements that Kay was free to leave—Kay's consent was voluntary. (See, e.g., *People v. Williams* (2007) 156 Cal.App.4th 949, 961 [deferring to trial court's finding that the defendant's consent was voluntary where officers "went out of their way to be courteous," even where the defendant was in custody].)

But this does not end our inquiry because where, as here, a defendant "claims a consent to search is tainted by a prior Fourth Amendment violation, mere voluntariness of the consent is not enough." (*People v. Boyer* (2006) 38 Cal.4th 412, 450.) Instead, pursuant to "the so-called attenuation doctrine" (*McWilliams, supra,* 14 Cal.5th at p. 437), we must examine whether the defendant's consent to search and resulting "evidence was obtained by the government's exploitation of the illegality or whether the illegality has become attenuated so as to dissipate the taint." (*Boyer, supra,* at p. 448.)

9

"In conducting the attenuation inquiry, courts are guided by three factors first set out in *Brown v. Illinois* (1975) 422 U.S. 590, 603–604 . . . :  (1) the 'temporal proximity' between the unlawful conduct and the discovery of evidence; (2) the 'presence of intervening circumstances'; and (3) the 'purpose and flagrancy of the official misconduct.'  [Citation.]  Once the defendant establishes a Fourth Amendment violation, the prosecution bears the burden of establishing admissibility under this exception to the exclusionary rule."  (*McWilliams*, *supra*, 14 Cal.5th at p. 438.)

For purposes of our analysis, we assume (without deciding) that officers subjected Kay to an unlawful detention.  Applying the *Brown* factors here, we nonetheless conclude that suppression of the evidence seized from Kay's bedroom is unwarranted because his consent to the search was sufficiently attenuated from any Fourth Amendment violation.

The first *Brown* factor favors suppression, as virtually no time elapsed between the end of Kay's allegedly unlawful detention and his consent to the search that produced the challenged evidence.  This factor, however, is the least determinative.  (See *People v. Brendlin* (2008) 45 Cal.4th 262, 269–270 (*Brendlin*).)

The second *Brown* factor, in contrast, cuts against suppression.  Officer Purece addressed Kay primarily as a witness, rather than a suspect, twice informed Kay that he was free to leave the scene, and stated expressly that Kay's ability to leave was not conditioned on his providing consent to search his bedroom.  These intervening circumstances interrupted "the chain of causation proceeding from" the allegedly unlawful detention that otherwise might have tainted Kay's consent to the search.  (*Brendlin*, *supra*, 45 Cal.4th at p. 269.)

Finally, the third *Brown* factor—generally regarded as "the most important" because of its direct tie to the exclusionary rule's

purpose of deterring police misconduct (*Brendlin, supra*, 45 Cal.4th at p. 271)—also counsels against suppression. "[T]here is no indication" that Kay's detention "was part of any systemic or recurrent police misconduct." (*Utah v. Strieff* (2016) 579 U.S. 232, 242.) To the contrary, officers detained Kay to permit them to investigate "what was happening inside a house whose occupant[ ] [was] legitimately suspected" of wrongdoing. (*Ibid.*) "This was not a suspicionless fishing expedition 'in the hope that something would turn up.' [Citation.]" (*Ibid.*) And as noted, *ante*, Officer Purece did not attempt to exploit the potentially coercive effects of any unlawful detention in procuring Kay's consent. Rather, he told Kay unambiguously that he was free to leave the scene, whether or not he provided the requested consent.

Accordingly, we conclude that Kay's consent was sufficiently attenuated from any Fourth Amendment violation, and the trial court therefore properly denied Kay's motion to suppress.[5]

---

[5] Because "we exercise our independent judgment" in reviewing Kay's Fourth Amendment claim (*Glaser, supra*, 11 Cal.4th at p. 362), we do not further address his argument that the trial court "wrongly placed the burden of proof on the defense" at the suppression hearing.

## DISPOSITION

The order denying Kay's motion to suppress is affirmed.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:



CHANEY, J.



WEINGART, J.