Filed 9/12/22  P. v. Guzman CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>GUSTAVO GUZMAN,<br><br>　　　Defendant and Appellant. | B303524<br><br>(Los Angeles County<br>Super. Ct. No. BA400013-01) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County, George G. Lomeli, Judge.  Convictions and non-gang-related enhancement affirmed; gang-related enhancements and gang-related special circumstance vacated and remanded for a new trial.

　　　Stephen M. Vasil, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne, Jr. and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Gustavo Guzman was convicted of the first degree murders of Steven Robinson, Aric Lexing, and Scott Grant (Pen. Code, § 187)[1] and sale of methamphetamine (Health & Saf. Code, § 11379, subd. (a)), with associated enhancements and special circumstances found true.  On appeal, Guzman contends: (1) the court should have excluded evidence obtained by an undercover informant; (2) the court erred in admitting evidence pertaining to a traffic stop of the car in which Guzman was riding shortly after the Lexing and Grant murders; (3) the prosecutor committed error by failing to disclose evidence to the court; (4) the court erred in excluding evidence that a weapon was used in another shooting; and (5) statutory changes made by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699) require reversal of all gang enhancements, gang-murder special circumstances, and gang-related firearm enhancements.  We affirm the convictions, but vacate the gang-related special circumstance and enhancement findings and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Robinson was shot to death on March 9, 2007; Grant and Lexing were shot to death on July 20, 2007.  The killings took place near the territory of the 18th Street gang, and the .45 caliber bullets that struck Robinson, Lexing, and Grant were fired from the same handgun.

The crimes went unsolved for several years, until an FBI informant within the 18th Street gang recorded a conversation between two members of 18th Street gang leadership, Guzman

---

[1]     Undesignated statutory references are to the Penal Code.

and Edgar Lopez. Guzman and Lopez reminisced about two shootings they had carried out, and they provided enough detail about the crimes and subsequent events to permit the Los Angeles Police Department to determine upon further investigation that Guzman and Lopez were discussing the killings of Robinson, Grant, and Lexing.

Guzman was charged with the murders of Robinson (count 1), Grant (count 2), and Lexing (count 3), with multiple firearm enhancements and a gang enhancement alleged for each murder charge (§§ 187, 186.22, subd. (b)(1)(C), 12022.53, subds. (b)–(e)(1)). Two special circumstances were alleged: (1) Guzman intentionally committed each murder while he was an active participant in a criminal street gang and the murder was committed to further the activities of the gang (§ 190.2, subd. (a)(22)); and (2) Guzman was convicted of multiple murders (§ 190.2, subd. (a)(3)). Guzman was also charged with three counts of selling methamphetamine, each with a gang enhancement allegation (Health & Saf. Code, § 11379, subd. (a), § 186.22, subd. (b)(1)(A)) (counts 6, 7, and 8). Finally, the indictment charged Guzman with two counts of possession of a firearm by a felon, again with gang enhancement allegations (§§ 12021, subd. (a)(1), 186.22, subd. (b)(1)(A)) (counts 9 and 10). For all counts, the indictment alleged Guzman had previously been convicted of robbery (§ 211), which qualified both as a prior strike offense (§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and a prior serious felony (§ 667, subd. (a)(1)).

Before trial, Guzman pleaded no contest to the firearm possession counts and admitted the associated enhancement allegations.

3

With the exception of count 8, on which the jury was unable to reach a verdict, the jury convicted Guzman on all counts and found true both special circumstances and all allegations of the indictment. The court declared a mistrial on count 8.

Although the prosecution sought the death penalty, the jury was unable to agree on a penalty determination, leading the court to declare a mistrial on the penalty phase. The prosecution elected not to retry the penalty phase. For each of the three murders, the trial court imposed consecutive sentences of life in prison without the possibility of parole, plus 25 years to life for the firearms enhancement. For the remaining counts on which Guzman was found guilty, the court imposed a total determinate term of 16 years, 8 months. The court dismissed count 8 and struck the prior serious felony enhancement for all counts. Guzman appeals.

## DISCUSSION

### I. Statements to Undercover Informant

On January 27, 2010, a conversation among Guzman, Lopez, and others was recorded by a confidential informant within Guzman's gang who had been sent to Guzman's residence by an FBI agent as part of an interagency investigation of the gang and its connections to the Mexican Mafia. On the covert recording, Guzman and Lopez reminisced about two shootings they had committed, and they spoke in sufficient detail to permit the Los Angeles Police Department to determine they were discussing the killings of Robinson, Grant, and Lexing.

In several motions, Guzman moved to suppress the recorded statements on the ground they were obtained in violation of the Fourth Amendment to the United States

4

Constitution. In 2014, the trial court conducted a hearing on the motion. The evidence before the court was that the property where the recording took place contained a front structure, an attached smaller back structure, and a detached garage. The confidential informant's family lived in the front house. Guzman's girlfriend lived in the back structure, and the court assumed for purposes of the motion that Guzman lived there as well. Whether the confidential informant lived at the property was contested, but the informant had at least one car parked at the property, he kept his weights in the garage, and he identified the front house as his home on several occasions.

The confidential informant recorded conversations while in the detached garage with Guzman and Lopez. The FBI's understanding was that the informant and his family had access to the garage and the family dogs lived in the garage. On the recording, both Guzman and the informant made reference to the house being the informant's house. Guzman purchased beer for the group, and he and the informant agreed the informant would contribute money for the beer, which the informant then did. The informant suggested the participants in the conversation enter the garage, and Guzman agreed, saying he would talk to them about his court appearance earlier that day. The men went into the garage, and Guzman and the informant then discussed whether they should lock others out of the garage. During the gathering in the garage, Guzman and Lopez made statements tending to incriminate themselves in several murders with details matching the murders of Robinson, Grant, and Lexing.

The trial court did not make a finding as to whether the informant resided on the property and thus had a right to be in the garage. Instead, the court found that even if the informant

5

did not have the right to be in the garage, Guzman, who was a resident of the property, had permitted the informant to remain in the garage without objection and had therefore implicitly consented to his presence there. The court explained, "Courts have long recognized that no privacy interest exists when one voluntarily reveals certain information to a government agent, whether said statements be recorded or not. [¶] That Mr. Guzman may have had a misplaced belief that [the confidential informant], to whom he voluntarily revealed information, would not violate his confidence and/or trust is a risk that he assumed." The court denied Guzman's motion to suppress the recorded statements.

Guzman contends his murder convictions should be reversed because his recorded incriminating statements were obtained in violation of the Fourth Amendment. We review the court's factual findings for substantial evidence, but exercise our independent judgment in determining the legality of the search on the facts so found. (*People v. Tully* (2012) 54 Cal.4th 952, 979 (*Tully*).)

The Fourth Amendment guarantees the right to be secure in one's person, houses, papers, and effects against unreasonable searches and seizures by the government, and the California Constitution also protects against unreasonable government searches. (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13.) Both state and federal claims are measured by the same standard. (*People v. Camacho* (2000) 23 Cal.4th 824, 829–830.) Central to the Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy; that is, "a subjective expectation of privacy in the object of the challenged search [that] society [is] willing to recognize . . .

6

as reasonable." (*California v. Ciraolo* (1986) 476 U.S. 207, 211.) Using equipment to hear confidential communications that are inaudible to the unaided ear generally violates reasonable expectations of privacy; however, when communications are not confidential, this rule does not apply. (*People v. Henderson* (1990) 220 Cal.App.3d 1632, 1643–1644; *United States v. White* (1971) 401 U.S. 745, 751; *People v. Phillips* (1985) 41 Cal.3d 29, 53 (*Phillips*).) "[A] defendant cannot look to the law to redeem him from the untrustworthiness of a friend who may be a government informant, and who records or transmits their private conversations." (*Henderson*, at pp. 1652–1653.) As the Supreme Court has explained, "[H]owever strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities," and "[i]f the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks." (*White*, at pp. 749, 751; see also *Hoffa v. United States* (1966) 385 U.S. 293, 302 (*Hoffa*).)

Guzman has not established a violation of the Fourth Amendment. Substantial evidence supported the court's conclusion that Guzman impliedly consented to the informant's presence. Guzman voluntarily accompanied the informant into the garage, where they pooled money for the beers they shared and engaged in group conversation about a wide range of

subjects. Guzman spoke directly to the informant and knowingly carried on conversations in his presence. Guzman did not tell the informant to leave, nor did he take any steps to exclude or remove the informant. Because Guzman impliedly consented to the informant's presence, he did not have a legitimate expectation that statements he made in the informant's presence would be kept confidential. The Fourth Amendment does not protect a person's "misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." (*Hoffa*, *supra*, 385 U.S. at p. 302 [finding no interest protected by the Fourth Amendment where the defendant made incriminating statements to an informer who was in the defendant's hotel suite by invitation and heard conversations directed to him or knowingly carried on in his presence].) As the California Supreme Court has explained, "There is simply no constitutional principle that prohibits the recipient of a confidence from breaching the trust reposed in him not to disclose it to others, including the police." (*Phillips*, *supra*, 41 Cal.3d at p. 53.) Because Guzman had no reasonable expectation of privacy in the conversations he carried out with and in the presence of the informant, there was no Fourth Amendment violation here. (See *People v. Pride* (2019) 31 Cal.App.5th 133, 141 ["long-standing United States Supreme Court precedent hold[s] the Fourth Amendment affords no protection for voluntary communications with individuals who are secret government informers or agents"].)

Guzman argues that these Fourth Amendment principles apply only when the government has a reasonable suspicion that the target is engaged in criminal activity. Neither the California courts nor the United States Supreme Court has imposed any

8

such requirement, and, moreover, the government had reasonable suspicion that gang shot-caller Guzman was engaged in criminal activity: an FBI agent testified the informant was dispatched with recording equipment by an interagency task force on violent crimes in the course of an investigation of the gang and its connections to the Mexican Mafia pursuant to the federal Racketeer Influenced and Corrupt Organizations Act (RICO).  Guzman also raises a series of arguments about whether the informant had actual or apparent authority to consent to a search and whether the informant's authority was valid or invalid, but these arguments are irrelevant because the basis of the court's ruling was not the informant's authority or the validity of the informant's consent to a search; it was Guzman's consent to the informant's presence.  Finally, Guzman urges us to abandon the undercover informant line of cases based on trends in constitutional jurisprudence, the overcriminalization of everyday life, and developments in constitutional historiography. We are bound by the decisions of the California Supreme Court and the United States Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## II.    Evidence Relating to the Traffic Stop

Lopez and Guzman were stopped by a sheriff's deputy near the location of the killings shortly after they shot Grant and Lexing.  Guzman moved to suppress evidence of the stop.  The trial court denied the motion to suppress on multiple grounds, one of which was that the traffic stop had a lawful basis: the vehicle's headlights were off in the middle of the night.

9

Guzman argues the court erred in ruling the traffic stop was lawful because its finding that the stop was based on the vehicle's lights being off was not supported by substantial evidence. He notes the deputies involved in the traffic stop did not recall details of the stop when they were questioned in 2011, argues the sheriff's department's records from the stop did not support the inference that the stop was based on Guzman driving with his lights off, and claims the testimony of two deputies at the suppression hearing failed to establish reasonable suspicion for the traffic stop.

We previously considered the trial court's ruling on this motion to suppress in the case of Guzman's codefendant, Lopez, who joined in Guzman's motion, and we concluded the evidence was sufficient to support the court's finding that the reason for the traffic stop was that Guzman was driving at night without his headlights on. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 338–339 (*Lopez*).) As we stated in *Lopez*, "When reviewing challenges to the factual findings made by the trial court at a suppression hearing, we defer to the superior court's express and implied factual findings if they are supported by substantial evidence. ([*Tully, supra*, 54 Cal.4th at p. 979].) 'As the finder of fact in a proceeding to suppress evidence [citation], the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable.' (*People v. Woods* (1999) 21 Cal.4th 668, 673 [88 Cal.Rptr.2d 88, 981 P.2d 1019].) 'Accordingly, "[w]e view the evidence in a light most favorable to the order denying the motion to suppress" [citation], and "[a]ny conflicts in the evidence are resolved in favor of the superior

10

court ruling" [citation]. Moreover, the reviewing court "must accept the trial court's resolution of disputed facts and its assessment of credibility." ' (*Tully*, at p. 979.)

"Viewing the evidence in the light most favorable to the trial court's ruling, we conclude the evidence was sufficient to support the court's finding that the stop was prompted by the vehicle being operated at night without headlights. The deputy who pulled over Guzman and Lopez, Gabrielle Graves, testified she stopped the vehicle because it was approximately 3:00 a.m., it was dark outside, and the vehicle's headlights were off. At the hearing, which took place nearly a decade after the traffic stop, the deputy testified she initially had no independent recollection of the stop, but her recollection had been refreshed when she reviewed documents. Specifically, Graves testified she had reviewed the testimony she had given before the grand jury and looked at a log that described the stop as a 'suspicious person' stop, and from that she was able to remember that the vehicle had no lights on, even though the headlights were not mentioned in the documents she reviewed. The trial court found Graves's recollection of the reasons for the stop were 'extremely nebulous and greatly suffered in terms of specificity,' and it described her as 'a horrible witness.' However, the court rejected defendant Guzman's argument that Graves had committed perjury in her testimony, it did not reject her testimony, and it concluded Graves initiated the traffic stop because the vehicle's headlights were off. We ' "must accept the trial court's resolution of disputed facts and its assessment of credibility." ' " (*Lopez, supra*, 73 Cal.App.5th at pp. 338–339.)

11

Guzman's arguments do not persuade us otherwise. Guzman contends the trial court's statements indicate it misunderstood the law concerning refreshing a witness's recollection and the court improperly accepted Graves's recitation of the contents of a document without having personal knowledge of the facts being conveyed. (*Frio v. Superior Court* (1988) 203 Cal.App.3d 1480, 1485, 1491–1493.) We have reviewed the court's ruling and while particular phrases can be interpreted to support Guzman's interpretation, it is clear overall that the court concluded Graves's recollection was properly and successfully refreshed with a document after she testified that she did not have an independent recollection of the stop. As the court said, Graves had no independent recollection; she looked at the document; she saw the code for the traffic stop; and "she remembers it."

Guzman also argues Graves's testimony was so inherently implausible and internally inconsistent that no rational trier of fact could have believed that she recalled stopping Guzman because his headlights were off. " ' " 'To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " ' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 627.) It was not physically impossible for Graves's testimony to be true, nor was her testimony demonstrably false

without resorting to inferences or deductions. The trial court was well aware of Graves's shortcomings as a witness and put them on the record, but after observing Graves and listening to her testimony, the court did not believe she had committed perjury, and it believed she had stopped Guzman because his vehicle's headlights were off. While another judge might have reached a different conclusion, the evidence before the court supported the court's factual finding.

Guzman next offers a series of arguments challenging the sufficiency of a second deputy's testimony to support the trial court's finding. We need not address these arguments because, as previously discussed, the evidence provided by Graves was sufficient to support the court's finding.

Finally, Guzman asserts the trial court may have declined to consider particular sealed exhibits he attached to his motion to suppress, and "[a]ssuming" the court did refuse to consider the exhibits, such an action would have violated his right to due process. Guzman acknowledges the court never ruled it would not consider these exhibits. However, he observes that the court did decline to consider other exhibits he attached to his filings, and he speculates that the court did not consider the sealed exhibits because "it's difficult to conceive" the court would have ruled as it did if it had considered them. We do not presume error from a silent record. (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1229.)

## III. Prosecutorial Misconduct

Guzman argues the prosecutor committed misconduct under state and federal law in conjunction with the suppression hearing concerning the traffic stop. He argues the prosecutor knew, or should have known, that as of 2011 the deputies

13

involved in the 2007 traffic stop had not recalled the reason for the stop, but the prosecutor failed to "alert the trial court to this evidence" in briefs or when questioning the deputies at the suppression hearing. " 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819.) "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839 (*Crew*).)

It is not reasonably probable Guzman would have received a more favorable result without the alleged misconduct. As Guzman acknowledges, he included the information about the deputies' lack of recall in 2011 in his suppression motion and the attached supporting exhibits. Also, while Guzman questioned Graves during the suppression hearing, Guzman (1) elicited Graves's testimony that when she was questioned in 2011 she had not recalled the reasons for the stop, and (2) personally represented and argued to the court that Graves had been unable to recall the details of the traffic stop in 2011. Lopez's counsel also questioned Graves about her testimony in 2011, even

14

referring the court and parties to a particular page in the transcript of that testimony, and Graves testified that she had been unable to remember what she noticed about the car prior to the traffic stop. Because the information had been provided to the court, and because both the court and the parties were aware the deputies had no independent recollection of the traffic stop, we see no reasonable likelihood that a more favorable outcome would have resulted if the People had independently raised this already-presented evidence.

Guzman, in his reply brief, contends that during the suppression hearing, the prosecutor should have confirmed Guzman's representation to the court that when Graves had been questioned in 2011 about the basis of the stop, she did not remember the reason for the stop even after an attempt to refresh her recollection. We have reviewed the portion of the transcript to which Guzman refers. While cross-examining Graves, Guzman (who was representing himself at the time) attempted to ask Graves why she now remembered the reason for the traffic stop when she had not remembered it in 2011, but the court sustained the prosecutor's objection that the question posed was argumentative and compound. Guzman told the court he was asking his question because he had the transcript of Graves's 2011 testimony.

The trial court responded, "That may well be. I will accept her representation that she has no recollection of it." The court explained the process of refreshing recollection to Guzman.

Guzman said the prosecutor "asked her [Graves] the same question and refreshed her memory then."

"Right," said the court.

Guzman said, "And back then—I got it right here, 'No, ma'am, I don't'—she didn't remember."

The court said, "I agree. Perhaps no one refreshed her recollection then."

According to Guzman, the prosecution at this point should have confirmed Guzman's representation that the prosecutor had attempted to refresh Graves's memory in 2011. Even if the prosecutor should have done so, as Guzman posits, Guzman has failed to establish that it is reasonably probable that a result more favorable to him would have been reached if the prosecutor had confirmed that Guzman was correct about the effort to refresh Graves's recollection in 2011. (*Crew*, *supra*, 31 Cal.4th at p. 839.) The trial court was aware and accepted that Graves had not recalled the reason for the traffic stop when she testified in 2011. The existence or nonexistence of efforts to refresh her recollection in 2011 was collateral and of marginal relevance, and Graves has not established, nor do we believe, that it is reasonably possible that the trial court would have weighed the evidence differently or made different credibility determinations if the prosecutor had reiterated to the court that the prosecutor had attempted to refresh Graves's recollection years before.

## IV.   Exclusion of Firearms Evidence

The same .45 caliber firearm was used in the Robinson murder in March 2007 and the Grant/Lexing murders in July 2007. The People moved to exclude evidence that on the night of June 10, 2007, the same weapon was fired into the home of Javier Carrillo at 210 E. 93rd Street. An unidentified person reported hearing gunshots and "observed what appeared to be a male black figure standing in front of 208 E. 93rd Street." She

reported the "male black figure got into an unknown type [b]lack vehicle and drove off." The trial court repeatedly excluded this evidence as inadmissible third party culpability evidence, and we affirmed the ruling in Lopez's appeal. (*Lopez*, *supra*, 73 Cal.App.5th at pp. 340–341.)

Nevertheless, Guzman argues the evidence was not third party evidence at all, but rather evidence that tended to disprove the theory that the .45 caliber Sig Sauer gun discussed by Lopez and Guzman in the recorded conversation was the same .45 caliber gun used in the charged shootings. Guzman argues the evidence tended to "negate the material fact of identity" and was admissible because it was relevant. (Evid. Code, § 351). Guzman reasons that negating the inference that the .45 caliber weapon he discussed on the recording would then support an inference that he was not involved in the charged murders, or at least the Lexing and Grant murders. He asserts the court abused its discretion in excluding this evidence and in doing so, deprived him of his constitutional right to a defense. We review the trial court's evidentiary ruling for an abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.)

The trial court did not err. The fact that the .45 caliber gun used in the Robinson shooting was used in another shooting the month before the Lexing and Grant shooting did not tend to disprove the gun used in the shootings was the one Guzman and Lopez discussed in the recorded conversation. The evidence had no bearing on the question of identity for the Robinson shooting, because where the gun was in June (the time of the Carrillo shooting) is not evidence of where it was or who had it in March when Robinson was shot. All the evidence tends to prove is that the gun was out of Guzman's hands for a period of time after the

17

Robinson shooting and before the Grant and Lexing shootings, which is not inconsistent with and could explain Guzman's statement in the recorded conversation that he "kinda sold it, but . . ." followed by laughter. There was evidence, as Guzman notes, that guns involved in a murder are typically either destroyed or sold to other gangs, but that does not mean the gun could not have been returned to Guzman or someone else after it was used in the Carrillo shooting.

Further, to the extent that use of the .45 caliber gun in the later shooting was relevant to prove Guzman could not have been the one who used it to kill Lexing and Grant, its exclusion from the evidence before the jury was not prejudicial in light of the overwhelming evidence straight from Guzman and Lopez that they killed Lexing and Grant. Guzman and Lopez were recorded reminiscing and boasting about the murders, and they described the circumstances and aftermath of the murder in detail that corresponded to the other evidence at trial. Guzman described killing two people and then immediately being pulled over a few blocks away, near the intersection of Overhill and Slauson, by a female sheriff's deputy. The deputy did not know about the shooting because it had taken place just outside the Sheriff's Department jurisdiction in Los Angeles Police Department territory, and the two agencies did not share radio calls. They hid their large guns in a hiding place inside the car shortly before they were handcuffed and placed in a patrol car. They feared the guns would be found during the search, and they knew they would be subject to the death penalty for multiple murders if they were caught, but the weapons were not located and they were allowed to leave.

All these details corresponded to evidence presented at trial: the Lexing and Grant murders involved large caliber guns; the traffic stop took place shortly after the shooting of Lexing and Grant; the stop occurred near the site of the shooting but in the jurisdiction of the Los Angeles County Sheriff's department, while the shooting had occurred within the jurisdiction of the Los Angeles Police Department; the deputy who pulled them over was female; the responding deputies were not aware of anything urgent or dangerous happening that night; they were placed in a patrol car; their car was searched; no weapons were found; and they were permitted to leave. In the face of this overwhelming evidence of identity, any error in excluding evidence that the gun was out of Guzman's hands at some point during the three months between the Robinson and Grant/Lexing killings was harmless under either the *Watson* or *Chapman* test for prejudice. (*People v. Watson* (1956) 56 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18.)

## V.    Assembly Bill No. 333

Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333) amended section 186.22 to require proof of additional elements to establish a gang enhancement. (See Stats. 2021, ch. 699, §§ 1–4.) A " 'criminal street gang' " was formerly defined in section 186.22 as "any *ongoing organization, association, or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, former subd. (f), italics added.) Effective January 1, 2022, Assembly Bill 333

19

narrowed the definition of " 'criminal street gang' " to "an *ongoing, organized association or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.)

"Assembly Bill 333 also altered the requirements for proving the 'pattern of criminal gang activity' necessary to establish the existence of a criminal street gang. [Formerly], a 'pattern of criminal gang activity' mean[t] 'the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more [persons].' (§ 186.22, [former] subd. (e).) As of the effective date, Assembly Bill 333 redefine[d] 'pattern of criminal gang activity' to require that the last of the predicate offenses 'occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed,' and that the predicate offenses 'were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offenses is more than reputational.' (Assem. Bill 333, § 3; amended § 186.22, subd. (e)(1), eff. Jan. 1, 2022.) In addition, the currently charged offense cannot be used as a

20

predicate offense under the amendments. (*Id.*, subd. (e)(2).)" (*Lopez, supra*, 73 Cal.App.5th at p. 345.)

"Assembly Bill 333's changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22. Here, two other statutes that refer specifically to section 186.22 are implicated: section 190.2, subdivision (a)(22) and section 12022.53, subdivision (e)(1). Section 190.2, subdivision (a)(22) establishes a gang murder special circumstance: 'The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang.' " (*Lopez, supra*, 73 Cal.App.5th at pp. 346–347.)

"Section 12022.53 provides for sentence enhancements for the use of firearms in the commission of an enumerated felony. The statute first provides for escalating punishments depending on how the firearm is used. The least severe penalty is set forth in section 12022.53, subdivision (b), which provides for a consecutive 10-year term for a defendant who 'personally uses' a firearm in a felony. Next, a consecutive 20-year term is imposed under section 12022.53, subdivision (c), if the defendant 'personally and intentionally discharges a firearm' in the commission of the offense. Finally, section 12022.53, subdivision (d) provides for a consecutive sentence enhancement of 25 years to life when the defendant 'personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death' during the commission of the offense.

"While these subdivisions provide punishment for offenders who personally use a firearm during the commission of their crimes, the penalties may also be imposed on any person who is a principal in the offense under certain gang-related circumstances: First, the person who is a principal must be 'convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members' as set forth in section 186.22, subdivision (b). (See § 12022.53, subd. (e)(1)(A).) Second, '[a]ny principal in the offense' must have 'committed any act specified in subdivision (b), (c), or (d),' that is, any principal involved in the offense must have personally used a firearm in the escalating use categories provided in section 12022.53, subdivisions (b) through (d). (§ 12022.53, subd. (e)(1)(B).)" (*Lopez*, *supra*, 73 Cal.App.5th at p. 347.)

We have previously found that Assembly Bill 333 should be applied retroactively to appellants whose judgments were not final as of its operative date. (*Lopez*, *supra*, 73 Cal.App.5th at p. 344.) Accordingly, we agree with the parties that Guzman is entitled to the ameliorative effects of Assembly Bill 333's amendments to section 186.22 because his judgment was not final when the amendments took effect. (See *ibid*.) We also agree with the parties that because the definition of a criminal street gang has been narrowed by Assembly Bill 333 and new elements have been added to prove a criminal street gang and a pattern of criminal activity, the gang enhancement allegations, the gang-related firearm enhancement findings under section 12022.53, subdivision (e)(1), and the special circumstance finding under section 190.2, subdivision (a)(22) must be vacated; on remand, the People must be afforded the opportunity to prove the

22

enhancements and the special circumstance in compliance with the amended section 186.22. (*Lopez,* at pp. 347–348.)

Although the findings that a principal discharged a firearm in violation of section 12022.53, subdivisions (d) and (e)(1) must be vacated, we note that with respect to the murders of Lexing and Grant, the jury separately found true the allegation under section 12022.53, subdivision (d) that Guzman "personally and intentionally discharged a firearm . . . which caused great bodily injury or death" to Lexing and Grant. The jury's findings under section 12022.53, subdivision (d) carry the same penalty and remain intact.

## DISPOSITION

The convictions are affirmed. The gang enhancement allegation findings under section 186.22, the special circumstance findings under section 190.2, subdivision (a)(22), and the gang-related firearm enhancement findings under section 12022.53, subdivision (e)(1) are vacated, and the matter is remanded to the trial court to permit the People to retry these allegations, if they so choose.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

GRIMES, J.                    WILEY, J.

23